MARY S. JOHNSTON, Employee, Plaintiff-Appellant v. DUKE UNIVERSITY MEDICAL CENTER, and its subsidiary DUKE HEALTH COMMUNITY CARE (SELF-INSURED) Employer, Defendant-Appellees

No. COA09-1582

(Filed 19 October 2010)

**Workers' Compensation— timeliness of claim—interrelated injuries and conditions**

> The Industrial Commission correctly determined that plaintiff failed to file her workers' compensation claim in a timely manner and that her claims should be dismissed. Plaintiff, a nurse, began experiencing foot pain in 1992 and filed her first workers' compensation claim in 2001, which she conceded was time-barred; she filed another claim in 2007 for tarsal tunnel syndrome and Achilles tendinopathy; and she contended that these were new disabilities because the prior episodes had resolved. In instances in which an employee claims to have multiple interrelated and continuous conditions affecting the same part of the body, the employee has only one workers' compensation claim rather than several.

Appeal by plaintiff from an Opinion and Award entered by the North Carolina Industrial Commission on 7 August 2009. Heard in the Court of Appeals 13 May 2010.

> *Lennon & Camak, P.L.L.C., by George W. Lennon and Michael Bertics, for plaintiff-appellant.*

> *Cranfill Sumner & Hartzog LLP, by Amy L. Pfeiffer and Ashley Baker White, for defendant-appellees.*

ERVIN, Judge.

Plaintiff Mary S. Johnston appeals from an Opinion and Award entered by Commissioner Laura Kranifeld Mavretic on behalf of the Industrial Commission which denied and dismissed Plaintiff's claim for workers' compensation benefits because the Commission lacked jurisdiction over that claim. After careful consideration of Plaintiff's challenges to the Commission's order in light of the record and the applicable law, we conclude that the Commission's decision should be affirmed.

## I. Factual Background

Plaintiff is a Licensed Registered Nurse with a master's degree in nursing education. Plaintiff has worked as a nurse since 1982, and began her employment in the emergency room at Duke University Medical Center in February 1992. Plaintiff's work in the emergency room was performed in 12 hour shifts, with 95% of a nurse's time being spent walking and standing on hard floors.

Plaintiff began experiencing foot pain as early as 1992. As a result, Plaintiff's primary care physician, Dr. Holcombe, referred Plaintiff to Dr. Rhonda S. Cohen, a podiatrist. On 7 August 1992, Dr. Cohen diagnosed a lesion on Plaintiff's foot as porokeratosis.

Plaintiff returned to Dr. Cohen in February 1996, at which time she complained of "pain when walking on [her] left foot." On 28 June 1999, Plaintiff informed the Duke Acute Care Clinic that she was suffering from left arch pain and was diagnosed with plantar fasciitis. On 23 August 1999, Plaintiff reported ongoing pain in the "arch area" of her foot. Plaintiff was treated with orthotics and injections through 1 May 2000. After her foot pain failed to subside, Plaintiff requested that Dr. Holcombe refer her to an orthopedic surgeon, which resulted in her treatment by Dr. Samuel David Stanley.

Dr. Stanley initially saw Plaintiff in July 2000. According to Plaintiff, Dr. Stanley was of the opinion that her injury was work-related from "the first time he saw me." At that time, Plaintiff reported a history of "about a year's worth" of left heel pain stemming from plantar fasciitis. Dr. Stanley diagnosed Plaintiff with recalcitrant plantar fasciitis and treated her with "physical therapy, orthotics, nonsteroidal inflammatory medications, night splints, [and] cast immobilization." While undergoing treatment for recalcitrant plantar fasciitis, Plaintiff developed Achilles tendinitis and received extensive treatment for this condition as well.

After more conservative treatment failed to bring relief, Plaintiff underwent a surgical debridement of the tendon in September 2001, followed by several months of post-operative treatment. Although Dr. Stanley advised Plaintiff against returning to work, she went back to work in the emergency room on 4 December 2001. Dr. Stanley provided her with medical orders explaining the necessity for Plaintiff to have modified duties, including reduced daily working hours.

On 5 January 2001, Plaintiff notified her employer of her "chronic plantar fasciitis" by submitting a Form 19. By means of a letter dated 26 January 2001, Plaintiff was informed that Duke University Medical

Center had denied her claim for workers' compensation benefits and that she could contact the Commission in the event that she had any questions. Plaintiff also received a Form 61 dated 19 January 2001 notifying her that her employer had denied her claim for workers' compensation benefits and explaining that she had the option of filing a Form 33 with the Commission in the event that she disagreed with Duke's decision to deny her claim.[1] After Plaintiff failed to take any further action for the purpose of prosecuting her claim for workers' compensation benefits, Duke sent Plaintiff a letter dated 17 September 2001 for the purpose of notifying her that her claim had been closed.

Plaintiff was transferred from the emergency room to a patient resource manager position in March 2002. Although Plaintiff's patient manager position required less walking than had been necessary in connection with her job as an emergency room nurse, she was still on her feet approximately 50% of the time in her new position. In addition, Plaintiff continued to have bilateral foot and ankle symptoms and to miss work on an intermittent basis following her transfer to the patient manager position.

In January 2004, Plaintiff complained of a "band-like pain extending around the ankle" and bilateral numbness. Given that he suspected tarsal tunnel syndrome or a neuropathy, Dr. Stanley ordered that nerve conduction studies be performed. At the time that Plaintiff returned to his office on 10 February 2004, Dr. Stanley reviewed the results of the nerve conduction studies, which suggested that Plaintiff had tarsal tunnel syndrome, and an MRI of Plaintiff's left foot, which showed posterior tibial tendinopathy and a possible ganglion cyst with no evidence of plantar fasciitis. As a result, Dr. Stanley referred Plaintiff to Dr. James A. Nunley, II, the Chief of Duke's Division of Orthopedic Surgery and the Chief of Duke's Foot and Ankle Service.

Dr. Nunley saw Plaintiff on 28 April 2004. At that time, Dr. Nunley concluded that Plaintiff suffered from tarsal tunnel syndrome, posterial tibial tendon disease, Baxter's nerve compression, and a ganglion cyst. Moreover, based on the recent MRI, Dr. Nunley concluded that Plaintiff did not have plantar fasciitis. Although he recommended that Plaintiff consider further surgery, Plaintiff did not receive further treatment from Dr. Nunley due to a personality conflict.

---

1. Although Duke did not provide her with a copy of a Form 18 at the time that it rejected her contention that she was entitled to workers' compensation benefits, the Industrial Commission rules in effect at that time, unlike the rules in effect now, did not require the employer to do so.

Plaintiff was discharged from her employment at Duke in March 2004 because she needed to care for a sick aunt in Houston, Texas, and lacked sufficient sick or vacation time to cover her absence. Upon returning to North Carolina, Plaintiff began working as an admissions nurse for hospice patients at Duke University Community Care on 1 June 2004. Although Plaintiff was not on her feet as much in the hospice nurse position as she had been in her previous positions, her duties as a hospice nurse still required her to spend substantial time standing and walking on hard surfaces.

Plaintiff worked as a hospice nurse for approximately one year without receiving additional medical treatment. However, her symptoms worsened in 2005, causing her to return to Dr. Stanley. In the summer of 2005, Dr. Stanley referred Plaintiff to Dr. Mark Easley, an orthopedic surgeon at Duke Health Center, for the purpose of obtaining a second opinion. At that time, Dr. Easley concluded that Plaintiff had tarsal tunnel syndrome. In addition, he noted the presence of Achilles tendinopathy. At his initial consultation with Plaintiff, Dr. Easley recommended conservative treatment, such as a heel lift and orthotics, but also noted the existence of a surgical option. On 10 October 2005, Dr. Easley performed various surgical procedures on Plaintiff, including a right Achilles tendon debridement, a right side tarsal tunnel release, and a calcaneal exostectomy repair of the Achilles tendon.

In Dr. Stanley's opinion, Plaintiff was temporarily disabled during various periods of time following the 2001 surgery. According to Dr. Stanley, tarsal tunnel syndrome is distinct from plantar fasciitis and Achilles tendinopathy "in that you can have it and not have the other [two]." However, Dr. Stanley also testified that plantar fasciitis and tarsal tunnel syndrome are related conditions, so that, "if you have plantar fasciitis, the inflammation can increase pressure in the tarsal tunnel and can lead to tarsal tunnel syndrome," making it not uncommon to see the two together. Similarly, Dr. Easley opined that Plaintiff's plantar fasciitis and tarsal tunnel syndrome "overlap" and "go hand in hand." Although Dr. Stanley signed a "Repetitive Motion Medical Questionnaire" which recited multiple diagnoses including tendinitis, tenosynovitis, and synovitis, Dr. Stanley described each of these diagnoses as subparts of the same overall condition. Plaintiff stopped working for Duke Health Community Care on 27 July 2005. Plaintiff has been unemployed and receiving both long and short-term disability benefits from Duke since at least 1 November 2005.

On 10 April 2007, Plaintiff filed a Form 18 with the Commission asserting her right to receive workers' compensation benefits from

Duke. Plaintiff alleged that she had become disabled due to "bilateral legs" on 1 August 2005. In a Form 33 relating to the denial of the claim asserted in the Form 19 that Plaintiff filed on 23 April 2007, Plaintiff alleged that she had sustained a "bilateral legs/psychiatric" injury on 5 January 2001.

Plaintiff's claims were consolidated for hearing and heard before Deputy Commissioner Kim Ledford on 27 February 2008. On 17 February 2009, Deputy Commissioner Ledford issued an Opinion and Award finding that Plaintiff had developed multiple occupational diseases of her feet and ankles, but that Plaintiff's workers' compensation claims based upon those conditions were time-barred. Both parties noted appeals to the Commission from Deputy Commissioner Ledford's order.

On 7 August 2009, the Full Commission filed an Opinion and Award in which it affirmed Deputy Commissioner Ledford's decision with modifications. In its order, the Commission agreed with Deputy Commissioner Ledford that Plaintiff's claims were time-barred. Plaintiff noted an appeal to this Court from the Commission's order.

## II. Legal Analysis

### A. Standard of Review

Generally speaking, " '[t]he findings of fact by the Industrial Commission are conclusive on appeal if supported by any competent evidence.' " *Adams v. AVX Corp.*, 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998) (quoting *Gallimore v. Marilyn's Shoes*, 292 N.C. 399, 402, 233 S.E.2d 529, 531 (1977)). However, " 'the Commission's findings of jurisdictional fact are *not* conclusive on appeal, even if supported by competent evidence. The reviewing court has the right, and the duty, to make its own independent findings of such jurisdictional facts from its consideration of all the evidence in the record.' " *Washington v. Traffic Markings, Inc.*, 182 N.C. App. 691, 696, 643 S.E.2d 44, 47 (2007) (quoting *Perkins v. Arkansas Trucking Servs., Inc.*, 351 N.C. 634, 637, 528 S.E.2d 902, 903-04 (2000)). The time limitations set out in N.C. Gen. Stat. § 97-58(c) are jurisdictional in nature. *Underwood v. Cone Mills Corp.*, 78 N.C. App. 155, 156-57, 336 S.E.2d 634, 636 (1985), *disc. review denied*, 316 N.C. 202, 341 S.E.2d 583 (1986); *Clary v. A.M. Smyre Mfg. Co.*, 61 N.C. App. 254, 257, 300 S.E.2d 704, 706 (1983) (stating that " 'the two-year time limit for filing claims under . . . [N.C. Gen. Stat. § 97-58(c)] is a condition precedent with which claimants must comply in order to confer jurisdiction on the Industrial Commission to hear the claim' ") (quoting *Poythress v. J.P. Stevens & Co.*, 54 N.C. App. 376, 382, 283 S.E.2d 573, 577 (1981), *disc. review denied*, 305 N.C. 153, 289

S.E.2d 380 (1982)). Thus, the dates upon which Plaintiff's claims accrued are matters of jurisdictional fact. "The Commission's conclusions of law . . . are reviewable *de novo.*" *Snead v. Carolina Pre-Cast Concrete,* 129 N.C. App. 331, 335, 499 S.E.2d 470, 472, *cert. denied,* 348 N.C. 501, 510 S.E.2d 656 (1998) (citing *Grantham v. R.G. Barry Corp.,* 127 N.C. App. 529, 491 S.E.2d 678 (1997), *disc. review denied,* 347 N.C. 671, 500 S.E.2d 86 (1998)).

The Workers' Compensation Act is to be "liberally construed so that the benefits thereof should not be denied upon technical, narrow and strict interpretation. The primary consideration is compensation for injured employees." *Hinson v. Creech,* 286 N.C.156, 161, 209 S.E.2d 471, 475 (1974) (quoting *Barbour v. State Hospital,* 213 N.C. 515, 517, 196 S.E. 812, 814 (1938); *see also Stevenson v. City of Durham,* 281 N.C. 300, 303, 188 S.E.2d 281, 283 (1972); *Hollman v. City of Raleigh,* 273 N.C. 240, 252, 159 S.E.2d 874, 882 (1968). "The evidence tending to support plaintiff's claim is to be viewed in the light most favorable to plaintiff, and plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence." *Adams,* 349 N.C. at 681, 509 S.E.2d at 414 (citing *Doggett v. South Atl. Warehouse Co.,* 212 N.C. 599, 194 S.E. 111 (1937)).

### B. Analysis of Commission's Decision

On appeal, Plaintiff challenges the Commission's determination that her workers' compensation claim was not filed in a timely manner as required by N.C. Gen. Stat. § 97-58 (2009). We do not find Plaintiff's argument persuasive.

N.C. Gen. Stat. § 97-58 provides, in pertinent part, that:

(b) The report and notice to the employer as required by [N.C. Gen. Stat. §] 97-22 shall apply in all cases of occupational disease except in case[s] of asbestosis, silicosis, or lead poisoning. The time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has same.

(c) The right to compensation . . . shall be barred unless a claim be filed with the Industrial Commission within two years after death, disability, or disablement as the case may be.

In *Taylor v. Stevens & Co.,* 300 N.C. 94, 101-02, 265 S.E.2d 144, 148 (1980), the Supreme Court held that these two statutory subsections must be read in *pari materia* and that, when these provisions are construed in that manner:

The two year period within which claims for benefits for an occu-
pational disease must be filed begins running when an employee
has suffered injury from an occupational disease which renders
the employee incapable of earning, at any job, the wages the
employee was receiving at the time of the incapacity, and the
employee is informed by competent medical authority of the
nature and work-related cause of the disease.

*Terrell v. Terminix Servs., Inc.*, 142 N.C. App. 305, 308, 542 S.E.2d 332,
334 (2001) (citing *Taylor*, 300 N.C. at 94, 265 S.E.2d at 144). Thus, the
ultimate issue that must be addressed in evaluating Plaintiff's chal-
lenge to the Commission's decision to deny and dismiss her occupa-
tional disease claim is whether Plaintiff was disabled by one or more
occupational diseases and learned of the work-related nature of her
condition within two years of the date upon which Plaintiff's request
for workers' compensation benefits was submitted to the Commission.

Plaintiff submitted two different claims to the Commission predi-
cated upon alleged bilateral leg injuries stemming from "repetitive work
on hard surfaces." Plaintiff claimed that the disability at issue in I.C.
No. 110233, which resulted from the Form 19 that she filed in 2001,
began on 5 January 2001. In her Form 18 filing in I.C. No. 758157, which
was submitted to the Commission on 10 April 2007, Plaintiff alleged that
her disability began on 1 August 2005. Plaintiff concedes that the claims
asserted in her 5 January 2001 Form 19 are time-barred. Therefore, the
ultimate question that we must answer is whether Plaintiff initially
became aware of the existence of the work-related disability at issue in
the 10 April 2007 Form 18 within the two years preceding the filing of
that document.

Plaintiff contends that her plantar fasciitis, pre-1 June 2004 Achilles
tendinopathy,[2] post-1 June 2004 Achilles tendinopathy, and tarsal tunnel
syndrome constitute separate occupational diseases and should be
evaluated on an individual basis. Although Plaintiff concedes that her
plantar fasciitis claim and her claim for pre-1 June 2004 Achilles
tendinopathy are barred by the provisions of N.C. Gen. Stat. § 97-58(c),
she argues that the same is not true of her tarsal tunnel syndrome and
her post-1 June 2004 Achilles tendinopathy claims. In order to reach this
conclusion, Plaintiff argues that, since her pre-1 June 2004 Achilles
tendinopathy had essentially resolved prior to the date upon which she

---

2. As we have already indicated, 1 June 2004 is the date upon which Plaintiff
began work as a hospice nurse for Duke Health Community Care after having been
unemployed for several months.

began work as a hospice nurse for Duke Health Community Care, her post-1 June 2004 Achilles tendinopathy constituted a new and distinct disability. Plaintiff further argues that she did not definitively learn that her tarsal tunnel syndrome and her post-1 June 2004 Achilles tendinopathy were work-related until a date less than two years prior to the filing of her workers' compensation claim. Based on this logic, Plaintiff contends that her post-1 June 2004 Achilles tendinopathy and her tarsal tunnel syndrome claims were submitted for Commission consideration in a timely manner.

Findings of Fact Nos. 22 through 26 discuss the timeliness of Plaintiff's workers' compensation claims for post-1 June 2004 Achilles tendinopathy and tarsal tunnel syndrome.

20. As of [P]laintiff's February 6, 2001 visit, Dr. Stanley had advised her of his opinion that her development of plantar fasciitis was associated with her employment in the Duke University Medical Center emergency room. According to the evidence, [P]laintiff was first disabled from plantar fasciitis and other foot problems at the end of 2000, when Dr. Stanley took [P]laintiff out of work for approximately five weeks.

21. Plaintiff was informed by Dr. Stanley soon after having been diagnosed with Achilles tend[i]nitis that the condition was related to her employment. According to the medical records, Dr. Stanley made this observation to [P]laintiff by no later than June 2001. Dr. Stanley also testified that he discussed, on multiple occasions, [P]laintiff's diagnoses and her employment's contributions to her conditions. The first surgery for [P]laintiff's Achilles tendon condition was performed in September 2001. Plaintiff was totally disabled following this surgery.

22. Although Dr. Stanley diagnosed [P]laintiff with tarsal tunnel syndrome in 2004 and informed her of this condition's connection to her employment at this time, he had suspected tarsal tunnel syndrome early in his treatment of [P]laintiff. Plaintiff had an EMG nerve conduction study early in 2000 which was negative and again in 2004 which was positive. Dr. Stanley explained that he believed the condition was present throughout the time he treated her, but that tarsal tunnel syndrome is difficult to diagnose and does not necessarily result in EMG nerve conduction study changes.

23. Dr. Stanley also testified that plantar fasciitis and tarsal tunnel syndrome are related conditions, specifically stating, "[I]f

you have plantar fasciitis, the inflammation can increase pressure in the tarsal tunnel and can lead to tarsal tunnel syndrome. So, they are not uncommonly seen together."

24. Dr. Stanley's opinions were reinforced by Dr. Easley, who testified that plantar fasciitis and tarsal tunnel syndrome "overlap" and "go hand in hand," and further that tarsal tunnel syndrome "is sometimes or frequently difficult to distinguish from plantar fasciitis."

25. By early 2001, [P]laintiff was informed by her treating physicians that all her foot problems, including possible tarsal tunnel syndrome, were related to her employment. At his deposition Dr. Stanley stated that he and [P]laintiff "had discussions every time I met her about the work requirements and her being on her feet." Plaintiff was initially disabled from employment related to her foot conditions in 2000 and 2001. Plaintiff's subsequent foot conditions and periods of disability were all related to the foot problems diagnosed by 2001. Furthermore, [P]laintiff testified that she filed these workers' compensation claims for the same conditions from which she had suffered for years.

26. Although [P]laintiff was aware of the work-related nature of her foot problems by 2001 and experienced periods of total disability related to her foot problems in 2000 and 2001, [P]laintiff did not file her workers' compensation claims until April 2007.

In sum, the Commission concluded that Plaintiff's claims were time-barred because each of the conditions from which Plaintiff suffered had been diagnosed before the beginning of the relevant two-year period, that all of these conditions were interrelated to conditions that had been diagnosed as early as 2001, that she had been continuously experiencing foot-related problems since 2000 or 2001, and that Plaintiff had been clearly advised that the problems she was experiencing with her feet were work-related some six or seven years prior to the date upon which she filed her request for an award of workers' compensation benefits with the Commission. We see no error in the approach adopted by the Commission.

As previously noted, the two-year period within which an occupational disease claim must be filed with the Commission pursuant to N.C. Gen. Stat. § 97-58(c) begins to run when the employee learns that he or she has a work-related disability stemming from that occupational disease. *Dowdy v. Fieldcrest Mills, Inc.*, 308 N.C. 701, 714, 304

S.E.2d 215, 223 (1983). Plaintiff's argument that the two-year period prescribed in N.C. Gen. Stat. § 97-58(c) did not begin to run until 2005, based on her new employment beginning 1 June 2004 and an individualized evaluation of each diagnosis, is inconsistent with the essential thrust of prior decisions of this Court.

This Court has previously held that a claimant has only a single workers' compensation claim arising from a particular injury, not a series of separate claims that must be refiled each time the plaintiff reaches a new type of disability. In *Joyner v. J.P. Stevens & Co.*, 71 N.C. App. 625, 627, 322 S.E.2d 636, 637 (1984), *disc. review denied*, 313 N.C. 330, 327 S.E.2d 891 (1985), this Court directly addressed the issue of whether a subsequent change in a plaintiff's disability status created a new "accident" which had the effect of restarting the time limits within which workers' compensation death benefits were required to be filed. In holding that it did not, we stated that "[i]t would defy legislative intent to hold that subsequent changes in disability status arising from the same occupational disease create[] new 'accidents,' thereby renewing the time limit for claiming [N.C. Gen. Stat. §] 97-38 benefits." *Id.*; see also *Wilhite v. Veneer Co.*, 303 N.C. 281, 284, 278 S.E.2d 234, 236 (1981) (stating that "[t]he employee is required to file but a single claim," so that "it was not necessary for [the plaintiff] to file an additional claim for serious bodily disfigurement" given that "[h]is claim based on serious bodily disfigurement was encompassed by defendant's admission of liability and payment of temporary total disability benefits to [the] date of his death") (citing *Smith v. Red Cross*, 245 N.C. 116, 95 S.E.2d 2d 559 (1956)). As a result, we concluded that "the rule limiting occupational disease victims to a single claim for purposes of the statute of limitations in [N.C. Gen. Stat. §] 97-58(c) applies by analogy to allow occupational disease victims to claim only one 'accident' under [N.C. Gen. Stat. §] 97-38" and that "the onset of plaintiff's husband's disability on 23 December 1975 was the only 'accident' from which the [N.C. Gen. Stat. §] 97-38 time limits for benefits ran." *Joyner*, 71 N.C. App. at 627, 322 S.E.2d at 637. We believe that the same logic compels the conclusion that, in instances in which an employee claims to have multiple interrelated and continuous conditions affecting the same part of the body, the employee has only one workers' compensation claim rather than several. Thus, assuming that Plaintiff had a continuing and interrelated series of conditions causing her to suffer from a foot-related disability, the critical question that must be answered in order to determine when the two-year period specified in N.C. Gen. Stat. § 97-58 began to accrue in this case is when Plaintiff first became aware that she had a disability stemming from a work-related occupational disease of her foot.

JOHNSTON v. DUKE UNIV. MED. CTR.

[207 N.C. App. 428 (2010)]

Although she strenuously opposes the adoption of the approach which we have described above and deem appropriate, Plaintiff has cited no authority supporting the use of a diagnosis-by-diagnosis method of analysis of the type which she proposes, and we know of none. On the contrary, since an employee has only a single claim rather than multiple claims arising from the same basic set of circumstances, we believe that acceptance of Plaintiff's argument would be inconsistent with the "single-claim" rubric adopted in *Joyner* and *Wilhite* by requiring the filing of multiple claims arising from a single, continuous, interrelated occupational disease.[3] In addition, the adoption of Plaintiff's preferred approach would require the filing of multiple workers' compensation claims arising from the same basic set of facts, with a new filing being required on each occasion when a plaintiff's diagnosis changed. We do not believe that such a result would be beneficial for either employees or employers in the vast majority of cases. We agree with Plaintiff that an employee should not be barred from filing separate claims at separate times based upon injuries to, or occupational diseases affecting, different parts of his or her body, or upon separate and distinct injuries to, or occupational diseases of, the same part of the body. However, employees who have developed a continuous, interrelated work-related disability to the same part of the body should be required to assert their claims for workers' compensation benefits within two years of the date upon which they first learned that they had a work-related disability associated with that part of their body. In addition to its consistency with prior decisions of this Court and the Supreme Court, this approach has the merit of requiring the presentation of claims at a time when the relevant medical information is "fresher" and more attention can be paid to the medical treatment received by the employee.[4] Thus, we believe that the approach we have adopted for purposes of analyzing Plaintiff's challenge to the Commission's order is more consistent with the intent of the relevant statutory provisions, the relevant decisional law, and

---

3. Plaintiff is technically correct in arguing that *Joyner* is distinguishable from the present case in that the earlier case dealt with a change in disabilities rather than a change in diagnoses. However, we believe that the "single claim" logic adopted in *Joyner* and *Wilhite* provides us with helpful guidance in deciding this case.

4. According to Plaintiff, the interpretation of the relevant statutory provisions and decisions that we have adopted in this case creates the risk that an employee would be forever barred from seeking workers' compensation benefits in the event that he or she failed to make the necessary filing with the Commission following a short period of disability stemming from a relatively minor occupational disease and then developed more serious problems associated with the same part of the body at a later time. We do not believe that the prudential concern expressed by Plaintiff is well-founded. As we have expressly stated above, the rule we believe to be most consistent

sound policy considerations than the approach upon which Plaintiff's claims are premised.

The record clearly establishes that Plaintiff was aware of the connection between her foot problems, which underlie her claim for workers' compensation benefits, and the conditions of her employment by at least 2001 and that the foot problems, upon which her present claim for workers' compensation benefits is predicated, are interrelated with and part and parcel of the problems from which she suffered in earlier years. In his deposition, Dr. Stanley testified that, "very early on in my treatment of [Plaintiff], we talked about her job and the fact that it was contributing to the condition and exacerbating her symptoms." Plaintiff and Dr. Stanley discussed the possibility that Plaintiff was entitled to workers' compensation benefits as early as 2001, at which point Dr. Stanley "encouraged" Plaintiff to seek such benefits. As of 6 February 2001, Plaintiff had been diagnosed with "Achilles [t]end[i]nitis on the right side," which Dr. Stanley believed to be "related to the plantar fasciitis and the alteration of [Plaintiff's] gait." The Achilles tendinopathy from which Plaintiff suffered in 2005 following her employment as a hospice nurse was a chronic condition, rather than a new difficulty that developed for the first time after 1 June 2004. Although Dr. Stanley suspected that Plaintiff suffered from tarsal tunnel syndrome as early as 2000, he determined that certain EMG nerve conduction results suggested tarsal tunnel syndrome in 2004 and referred Plaintiff to Dr. Nunley. After examining Plaintiff in 2004, Dr. Nunley diagnosed her with tarsal tunnel syndrome, among other conditions, and would, consistent with his usual course of practice, have informed Plaintiff of his opinion at that time. According to Dr. Easley, it is frequently difficult to distinguish tarsal tunnel syndrome from plantar fasciitis. In fact, Dr. Easley testified that plantar fasciitis and tarsal tunnel syndrome "overlap" and "go hand in hand." Similarly, Dr. Stanley testified that plantar fasciitis and tarsal tunnel syndrome are commonly seen together. Plaintiff herself admitted

---

with the relevant statutory provisions and prior decisions only applies to situations involving an interrelated, continuing condition associated with the same part of the body. For that reason, we do not believe that the approach we have deemed appropriate here will result in the denial of workers' compensation benefits to an employee who is briefly disabled due to a minor condition and then has further, unrelated problems with the same part of his or her body at a later time. When forced to choose between the problems that will be created by treating every new diagnosis as a new claim and the problems associated with barring the claims of a plaintiff who fails to file his or her claim for workers' compensation benefits despite the existence of a disability due to a continuous and interrelated condition in the same part of the body, we prefer the approach that we have adopted in this case, since it will stimulate the filing of claims in a timely manner without creating an undue risk that genuinely meritorious claims that could not have reasonably been brought at an earlier time will be deemed time-barred.

that she was aware of the work-related nature of her foot problems by 2001. Finally, Dr. Stanley expressed the opinion that Plaintiff was temporarily totally disabled during 2001. As a result, the record evidence clearly shows that Plaintiff knew that she had a foot-related disability that was causally connected to the conditions that existed at her place of employment by 2001, some six years before she filed a claim for workers' compensation benefits with the Commission, and that her condition in 2005 was interrelated with and had been continuously similar to her condition for the last several years. As a result, we hold that the Commission correctly concluded that Plaintiff failed to file her claim for workers' compensation benefits in a timely manner and that her non-compliance with N.C. Gen. Stat. § 97-58(c) precluded the Commission from hearing her claims.

### III. Conclusion

As a result, we conclude that the Commission correctly determined that Plaintiff failed to file her claims for workers' compensation benefits in a timely manner and that her claims should be denied and dismissed for that reason. Thus, the Commission's order should be, and hereby is, affirmed.

AFFIRMED.

Judges BRYANT and ELMORE concur.